In The

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**Appeal Number 22-1942**

MICHAEL C. WORSHAM

*Plaintiff-Appellant*

v.

DISCOUNT POWER, INC.

*Defendant-Appellee*

*Appeal from the United States District Court for the District of Maryland*
Case #1:20-cv-00008-RDB
The Honorable Richard D. Bennett

## INFORMAL BRIEF OF PLAINTIFF-APPELLANT MICHAEL C. WORSHAM

Michael C. Worsham
1916 Cosner Road
Forest Hill, Maryland 21050
(410) 557-6192
michael@magicmichael.net
*Appellant*

## Table Of Contents


Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Issues for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Plaintiff Michael C. Worsham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Discount Power, Inc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7 Calls alleged in Worsham's Amended Complaint (AC) . . . . . . . . . . . 3

Subpoena traceback results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Subpoena results from Armstrong Telecommunications, Inc. (Armstrong) 5

Subpoena results from Peerless Network, Inc. and Inteliquent, Inc. . . . . 5

Subpoena results from Contact Center Specialists . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Issue 1: The District Court erroneously dismissed the entire original Complaint, almost the entire Amended Complaint, and claims for willful or knowing violations. . . . . . . . . . . . . . . 8

The District Court erroneously dismissed Worsham's treble damages claims for willful or knowing federal TCPA violations under 47 U.S.C. § 227(c). . . . . . . . . . . . . . . . . . . 9

Worsham adequately plead facts to support his claims under the willful or knowing liability standard in 47 U.S.C. § 227(c)(5) for Counts 1 and 2 . . . . . . . . . . . . . . . 9

*Willful* conduct under the TCPA . . . . . . . . . . . . . . . . . . . . . . 10

The *American Blastfax* quote the lower court relied on is erroneous 14

*Knowing* conduct and violations under the TCPA. . . . . . . . . . 16

**Table Of Contents**

*Universal Elections* supports a lower pleading threshold for knowing violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Issue 2: The District Court erroneously dismissed Counts 3 and 7, because FCC Caller ID regulations at § 64.1601(e)(1) were issued pursuant to 47 U.S.C. §§ 227(b) and (c) and include a private right of action. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A. *Travel Options* was uncertain and incorrect about § 64.1601(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B. There is a private right of action for Caller ID violations of § 64.1601(e)(1). . . . . . . . . . . . . . . . . . . 21

C. § 64.1601(e)(1) could not come from the TCPA's technical standards at § 227(d). . . . . . . . . . . . . . . . . . 25

(1) There is no FCC authority in § 227(d) for live telemarketing calls. . . . . . . . . . . . . . . . . . . . . . . . . . . 25

(2) There is no FCC authority in § 227(d) for Caller ID for ANY calls. . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Issue 3: The District Court erroneously dismissed Counts 4 and 8, which plead facts for claims for violating the FCC robocall regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A. Call 1: the AC plead that Call 1 was *initiated* and "constitutes telemarketing," and is not exempt even if not answered. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B. Calls 2 to 6: Many specific allegations in the AC plead facts that Calls 2-6 were initiated to deliver prerecorded voice messages for DPI. . . . . . . . . . . . . . 31

Issue 4: The District Court erred in dismissing Counts 9-17 and not recognizing the Maryland TCPA's (MD-TCPA) private right of action for FCC and FTC violations. . . . . . . . . . . . . 32

Counts 9-11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Counts 12-17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## Table Of Contents


| | | |
|---|---|---|
| Issue 5: | The District Court erred in not compelling and extending discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 |
| | 1. Motion to compel discovery. . . . . . . . . . . . . . . . . . | 36 |
| | 2. Motion to extend discovery . . . . . . . . . . . . . . . . . . | 39 |
| Issue 6: | The District Court erred in summary judgment by not considering TCPA liability under § 227(c)'s "on behalf of" language. . | 39 |
| Issue 7: | The District Court erred in summary judgment by not recognizing the non-delegation doctrine, which does not require agency. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 |
| | Sellers Have a Nondelegable Duty to Comply With the TCPA | 41 |
| | The FCC recognizes TCPA requirements as nondelegable. | 42 |
| Issue 8: | The District Court erred in awarding discovery sanctions without reviewing or even requesting the deposition transcript containing the testimony for which sanctions were awarded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44 |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

MICHAEL C. WORSHAM *

*Appellant* * Appeal #22-1942

vs. *

(Appeal from Case #1:20-cv-00008-RDB)

DISCOUNT POWER, INC. *

*Appellee* *

* * * * * * * * * * * * *

**<u>INFORMAL OPENING BRIEF OF APPELLANT MICHAEL C. WORSHAM</u>**

**1. Jurisdiction.**

Worsham seeks review of the August 4, 2022 Opinion and Order (ECF 302-303) of the U.S. District Court for Maryland, granting summary judgment to Discount Power, Inc. (DPI), and discovery and other Orders. There are no related prior appeals.

**2. Issues for Review**

**Issue 1: The District Court erroneously dismissed the entire original Complaint, almost the entire Amended Complaint, and claims for willful or knowing violations.**

**Issue 2: The District Court erroneously dismissed Counts 3 and 7, because FCC Caller ID regulations at § 64.1601(e)(1) were issued pursuant to 47 U.S.C. §§ 227(b) and (c) and include a private right of action.**

**Issue 3: The District Court erroneously dismissed Counts 4 and 8, which stated claims for violating the FCC robocall regulations.**

**Issue 4: The District Court erred in dismissing Counts 9-17 and not recognizing the Maryland TCPA's (MD-TCPA) private right of action for FCC and FTC violations.**

**Issue 5: The District Court erred in not compelling and extending discovery.**

**Issue 6: The District Court erred in summary judgment by not considering TCPA liability under § 227(c)'s "on behalf of" language.**

**Issue 7: The District Court erred in summary judgment by not recognizing the non-delegation doctrine, which does not require agency.**

**Issue 8:** **The District Court erred in awarding discovery sanctions without reviewing or even requesting the deposition transcript containing the testimony for which sanctions were awarded.**

## SUMMARY

The lower court erred in dismissing valid federal and MD-TCPA claims. In discovery it erroneously denied Worsham's motions to compel discovery from DPI and to extend discovery to complete call tracebacks, awarded sanctions to DPI, and sealing certain documents. In summary judgment, it erred by refusing to even consider § 227(c) claims which do not require agency, and by rejecting the Supreme Court's non-delegation doctrine, and in denying Worsham, and granting DPI, summary judgment.

## BACKGROUND

### Plaintiff Michael C. Worsham

Worsham lives in Forest Hill, Maryland, maintaining his residential land line number 410-692-2749 there continuously since moving there. Worsham Affidavit at ¶ 1 (ECF 276-2). On July 15, 2006 he entered this residential number on the National Do Not Call (DNC) list, where it has been continuously including during the November 2019 period of the seven calls at issue. *Id.*, Aff. at ¶ 2.

On January 5, 2017 Worsham received a prerecorded voice message ("robocall") from DPI, for which Worsham sued DPI in March 2017 in small claims Case #901-1386-2017, District Court of Maryland for Harford County ("Suit #1"). *Id.,* Aff. at ¶¶ 3-4, ECF 34-1 (copy of Suite #1). Suit #1 settled during 2017.

The content of DPI's January 5, 2017 robocall message in Suit #1 included the phrase "*This notice concerns a recent letter you received . . .*" regarding an electric rate

discount, and said *"Press 0 to speak to a representative"* followed right away by "*Press 0 to connect*." Worsham Aff. at ¶ 4. DPI's 2017 robocall did not identify the caller, and after pressing 0, Worsham got a live sales agent who said that the caller was Discount Power. *Id.,* Aff. at ¶ 4.

**Discount Power, Inc.**

DPI is a Connecticut electric power re-seller which obtains customers through telemarketing, including prerecorded voice messages.

Besides Suit #1, DPI was sued for making illegal robocalls on April 27, 2018 in a class action, *Abramson, et al. v. Discount Power, Inc.*, Case # 3:18-cv-00728 (D. Conn.). The *Abramson* suit alleged DPI made robocall solicitations to Abramson during March 2018 using spoofed Caller ID which offered a 15% discount on electricity.

**7 Calls alleged in Worsham's Amended Complaint (AC)**

Despite Suit #1, DPI called Worsham's residential land line number through its Florida telemarketer Hound Energy, LLC seven times during a five day period during November 2019. AC (ECF 54) at ¶ 15, Worsham Aff. at ¶¶ 3-5, 9-16, 18.

Of the 7 calls, Worsham did not answer the first call on November 11, 2019, the next 5 calls were prerecorded voice robocall solicitations for an electricity discount, and the last call on November 15, 2019 was a live call from the same DPI agent identified as "Joselyn" who had spoken with Worsham earlier that same day after Worsham received a robocall (Call #5) and pressed 1 for a live agent. *Id.* Discount Power was not identified in any of its prerecorded robocall messages delivered to Worsham's residential land line number 410-692-2749, which stated:

**<u>Call #2</u>:** Delivered this prerecorded message in a male voice:

> "**Hello. This is an apology call from your electric utility. You got overcharged by your third party supplier. You will be receiving a rebate check along with a 30% discount on your electric and gas bill. Please press one to get your rebate check**."

**<u>Calls #3, 4 and 5</u>:** All delivered the same prerecorded message in a female voice:

> **"Hello thank you for being a valued customer of BGE, also known as Baltimore Gas and Electric. The following is an important update regarding your account. Starting this month all current customers who have not missed any payments in the past 6 months will now be eligible for a discount for up to 30% off of their monthly bill. If you would like to check your eligibility, simply press one on your phone now."**

**<u>Call #6</u>:** Delivered this prerecorded message in a male voice:

> "**Hello. This is an apology call from your electric utility. You got overcharged by your third party supplier. You will be receiving a $100 bill adjustment, along with a 40% discount on your electric and gas bill. Please press 1 to adjust $100 in your bill. Please press 1 now**."

AC at ¶ 15, Worsham Aff. at ¶¶ 9-16, 18. Worsham entered audio recordings of all robocalls into the record (ECF 93).

DPI's calls transmitted the same Caller ID of "201-285-8284, Bayonne NJ" in Calls #1, 3, 4, 5, and 7. Worsham Aff. at ¶¶ 9-16. Worsham spoke with the same DPI sales agent named Joselyn in Calls #3, 4, 5, and 7. *Id.* at ¶¶ 11-15. Worsham's 410-692-2749 number is a residential line, and was on the national DNC list when Worsham received DPI's 7 telemarketing calls from November 11-15, 2019. *Id.* at ¶¶ 1, 2, 18.

**<u>Subpoena traceback results</u>**

Worsham issued subpoenas to telecommunications carriers to traceback calls to their origin. Call trace back is necessary because the (1) Caller ID transmitted by DPI and its agents was spoofed, (2) calls failed to transmit the required Caller ID name, and

(3) telephone calls go through many different telecommunications companies due to ordinary least cost routing.

Subpoena results revealed that 5 of 7 calls were made and originated from the carrier Contact Center Specialists, LLC (CCS) by one of its customers, a Pakistani company doing business as Xtrasource and/or Xtra Source BPO (Business Process Outsourcing). Xtrasource was hired by DPI's telemarketer, Hound Energy, to make calls for and on behalf of DPI to generate new customers.

**<u>Subpoena results from Armstrong Telecommunications, Inc. (Armstrong)</u>**

The call traceback subpoena results started with the response from Worsham's own carrier, Armstrong. Armstrong identified two carriers, Inteliquent, Inc., and Peerless Network, Inc., as having transmitted 5 calls, and 1 call (Call #4), respectively, of the 7 calls total. Armstrong's April 27, 2022 subpoena response was filed as ECF 26-2, and its October 27, 2021 clarifying letter with updated subpoena response information was filed as a supplement, ECF 276-3.

**<u>Subpoena results from Peerless Network, Inc. and Inteliquent, Inc.</u>**

Worsham next subpoenaed Peerless Network and Inteliquent. Peerless's response, including the December 14, 2021 Affidavit of its records custodian Patrick Phipps, were filed as ECF 160-1/160-2 (wide Excel spreadsheet). Importantly, Peerless identified CCS as the carrier owning or holding the 201-285-8284 number transmitted as the Caller ID for 5 of the 7 calls. Worsham Aff. at ¶¶ 31-32.

The subpoena response from Inteliquent was filed under seal. Inteliquent's response identified the following carriers as the ingress carrier (carrier that transmitted

the call to Inteliquent) for these five calls:

| Call# | Date of Call | Time of Call | Ingress Carrier to Inteliquent |
|---|---|---|---|
| 1 | Nov. 11, 2019 | 10:50 AM | Comcast Digital Voice |
| 2 | Nov. 11, 2019 | 5:37 PM | Bandwidth.com CLEC LLC |
| 3 | Nov. 12, 2019 | 1:49 PM | 382.com |
| 5 | Nov. 15, 2019 | 12:01 PM | 200 Networks |
| 7 | Nov. 15, 2019 | 2:37 PM | 200 Networks |

Worsham issued Court-approved subpoenas to all the above carriers. These carriers in turn identified several upstream carriers who transmitted part of one or more of the calls. However, discovery closed before Worsham could complete the call traceback process for all calls all the way back to the originating caller. In one instance, one of the intermediary carriers no longer had the relevant data, because the carrier only keep data for about a year. The carrier subpoena responses were filed as part of motions to extend discovery, which the lower court ultimately denied before all call tracebacks could be completed. *See* Worsham Aff. at ¶¶ 30-33, and *e.g*. ECF 160-3 (Affidavit of 362 Communications Corp.).

Importantly, the 201-285-8284 spoofed Caller ID number was used to identify the originating caller for 5 of the 7 calls, even if the uncompleted call traceback process was not able to identify the entire path and every carrier in that path for all calls.

**Subpoena results from Contact Center Specialists**

CCS's responded via email, and later an Affidavit. CCS's email identifying the date and time of the five calls sent by Xtrasource (aka Xtra Source BPO) on November 11, 12, 14, 15, corresponding to Calls #1, 3, 4, 5, and 7 of the AC, was filed as ECF 233-4. CCS's February 15, 2022 records custodian Affidavit was filed as ECF 233-5.

DPI itself identified Xtrasource as connected to Hound Energy and responsible

for providing telemarketing to DPI during November 2019. DPI Interrogatory Answer #5 admitted:

> **Xtrasource-Hound Energy, LLC and AGR Group, LLC provided telemarketing services to DPI in Maryland during the period of the alleged calls to Plaintiff on November, 11, 12, 14 and 15, 2019.**

ECF 109-1, DPI

The undisputed facts are that Calls #1, 3, 4, 5 and 7, which transmitted the same 201-285-8284 Caller ID number, were made using the carrier CCS by Xtrasource/Xtra Source BPO, a sub-agent calling for and on behalf of Hound Energy, who was hired by and was calling for and on behalf of DPI.

The robocall messages in Calls #2 and #6 were very similar. Both misleadingly presented the caller as if it was an electric utility, solicited an electric bill discount offer, instructed the recipient to press one (1) to obtain the discount, and failed to identify the caller, company, or a phone number during the message. These hallmarks were all present in all of the other robocall messages delivered during the same four days in November. Worsham Aff. at ¶¶ 11-15, Audio call disk. For Call #6, after the robocall message, the sales agent Worsham was connected to identified Discount Power as the entity on whose behalf the call was being made. *Id.* at ¶ 15.

## ARGUMENT

The lower court's errors began with dismissing the entire original Complaint. The errors continued with not compelling discovery from DPI relevant to showing agency between DPI and its telemarketers. Within this, the lower court denied Worsham the very discovery necessary to establish agency, while simultaneously ruling

that proof of seller-telemarketer agency is the only way to establish liability.

The most egregious error was the court's explicit refusal to even consider TCPA claims in Count 1 and 5 under § 227(c) and its broader "on behalf of" liability language, which does not require proof of seller-telemarketer agency.

**Issue 1: The District Court erroneously dismissed the entire original Complaint, almost the entire Amended Complaint, and claims for willful or knowing violations.**

Issues 1-4 are related, but are presented as separate issues for clarity.

On January 6, 2021 the District Court dismissed the entire Complaint. ECF 47. This dismissal was egregiously wrong, and not obviated by the enormous effort Worsham had to undertake just to get the lower court to eventually reinstate federal TCPA Counts 1 and 2, and their MD-TCPA counterparts in Counts 5 and 6. On May 13, 2021 Worsham filed the AC (ECF 54) with the same 17 Counts. At first the lower court allowed only Counts 1 and 5 (DNC violations) to go forward, but later, after Worsham's motion, allowed Counts 2 and 6 (identification failures).

The lower court's reluctance to eventually recognize these four Counts still leaves many federal and MD-TCPA claims from the AC improperly dismissed, as well as treble damages claims for Counts 1 and 2. The dismissals not only eliminate claims, but also effects discovery, as more claims invariably justifies more discovery.

The improper dismissal of Worsham's claims under the federal TCPA for willful or knowing violations is discussed immediately below. The other dismissed MD-TCPA claims are addressed further below within Issues 2-4.

**The District Court erroneously dismissed Worsham's treble damages claims for willful or knowing federal TCPA violations under 47 U.S.C. § 227(c)**

The lower court dismissed Worsham's claims for treble damages for willful or knowing violations in the Complaint, and AC, and did not allow discovery on these claims. ECF 257. It inexplicably stated that "Worsham has failed to plead any facts to support his allegations that Discount Power violated the TCPA willfully or knowingly." ECF 47 at 15, ECF 74 at 14 (same exact quote). The threshold to plead a willful or knowing violation of the TCPA is not very high, and Worsham easily met the "short and plain statement" pleading standard under FRCP 8(a), for the federal TCPA Counts 1 and 2 which the court belatedly allowed.

**Worsham adequately plead facts to support his claims under the willful or knowing liability standard in 47 U.S.C. § 227(c)(5) for Counts 1 and 2**

Counts 1 and 2 arise under § 227(c)(5), which has a private right of action for a "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations."

The TCPA also provides for up to treble the amount of the actual or statutory damages if "the court finds that the defendant willfully or knowingly violated the regulations," and provides in full:

(c) Protection of subscriber privacy rights

(5) Private right of action

> If the Court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(c)(5). Subparagraph (B) provides for actual damages, or statutory damages up to $500, for each violation.

This language above uses the disjunctive "or" in establishing the conduct giving rise to treble damages: violations done willfully **or** knowingly. A defendant's violations need only be done willfully, or, knowingly, but not both, for treble damages.

**_Willful_ conduct under the TCPA**

Federal communications law defines "*willful*," which the AC alleged at ¶ 66:

> (1) The term "*willful*", when used with reference to the commission or omission of any act, means the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this chapter or any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States.

47 U.S.C. § 312(f). A *willful* act is simply an intentional or deliberate act, regardless of any intent to violate the law. *Baltimore–Washington Tel. Co. v. Hot Leads Co.*, 584 F. Supp. 2d 736, 745 (D. Md. 2008). An inadvertent or accidental act would not be *willful* conduct.

The AC easily met the federal pleading standard to allege DPI's violations were willful, or done willfully. DPI's acts were well plead to be intentional, and not inadvertent, including because multiple violations are alleged, which can not be explained away as mere inadvertence or accidental.

DPI's violations were multiple in two separate ways. First, in the number of violations within a single call. The lower court belatedly recognized two violations/call in Counts 1 and 2. Second, is the number of calls that violated the TCPA - seven calls total. The well plead allegations of multiple violations in each of the multiple calls is

a factual basis upon which Worsham alleged the violations were done willfully.

Specific AC allegations about DPI's *willful* conduct include detailed allegations in ¶ 15 about the 7 calls and Worsham's DNC requests made during the calls themselves, and the following additional allegations:

19. Defendant instructs its agents, employees and/or contractors to avoid identifying Defendant, and that if asked to identify Defendant to respond that Defendant is the "state licensed supplier for BG&E" or similar term that fails to identify Defendant.

20. Defendant is fully aware of the TCPA's requirements, and intentionally uses or allows the use of robocalls and lead-generating telemarketers and associated practices to avoid people like Worsham from identifying it other persons involved until after personal information was provided or confirmed, so that Defendant controls who calls who, and to get around the TCPA's requirements, including precluding people from even making a meaningful or informed do not call request, and ignores DNC requests that are made.

28. Defendant exercised decision-making control over its respective policies, procedures and business practices, and made the decisions causing the violations alleged.

29. Defendant intentionally: (1) conspired and aided and abetted to call Plaintiff's and many other numbers despite the numbers being on the national DNC registry, (2) used agents to violate the law, (3) did not adequately identify itself in the calls, (4) called so inaccurate, false or incomplete Caller ID is transmitted, and (5) avoid delivering identifying messages to the voice mail of call recipients like Plaintiff.

50. Defendant intentionally, personally and substantially participated to help arrange for the solicitation calls to be initiated and ultimately delivered to Plaintiff's phone number.

56. Defendant willfully and knowingly ignores the national DNC list registry.

60. Defendant intentionally and misleadingly uses the initials and name of BGE, Baltimore Gas and Electric, in its voice messages, because it knows the people in Maryland that it targets recognize BGE, and are more likely to listen to the entire message instead of hanging up.

64. Defendant willfully and knowingly failed to clearly identify itself and the

individual callers during the pre-recorded messages calls, and did not provide the full name of the individual callers, or of any other persons on whose behalf the call was being made.

AC at ¶¶ 19, 20, 28, 29, 50, 56, 60 and 64. Allegations in ¶¶ 19, 56, 60 and 64 in particular support Counts 1 and 2, which the lower court eventually allowed.

As one example demonstrates, ¶ 15 alleges that during Call 3 on November 19, 2019 that:

> "[Joselyn] avoided identifying the company, and I had to ask her several times to get her to finally tell me the company were **Discount Power**. I told her not to call a few times, and hung up."

(bolding in AC). The disk with the audio recordings of the calls is in the record, so the Court can hear exactly what occurred during Call 3. These allegations for Call 3 provide the direct factual support for the *willful* conduct-related allegations in:

(I) ¶ 19 that "Defendant instructs its agents, employees and/or contractors to avoid identifying Defendant,"

(II) ¶ 20 that DPI "ignores DNC requests that are made,"

(III) ¶ 29 that "Defendant intentionally: (1) conspired and aided and abetted to call Plaintiff's and many other numbers despite the numbers being on the national DNC registry, . . . (3) did not adequately identify itself in the calls,"

(IV) ¶ 56 that "Defendant willfully and knowingly ignores the national DNC list registry," and

(V) ¶ 64 that "Defendant willfully and knowingly failed to clearly identify itself and the individual callers during the pre-recorded messages calls, and did not provide the full name of the individual callers, or of any other persons on whose

behalf the call was being made."

These paragraphs 19, 20, 29, 56 and 64 plead facts regarding the *willful* conduct directly related to the elements of Count 1 for alleged do-not-call list violations, and for Count 2 for alleged caller identification violations. The pleading standard for *willful* violations under the TCPA is not high, and the AC easily met this standard. *Charvat v. Ryan*, 879 N.E.2d 765, 771 (Ohio 2007) ("Congress chose to employ a low threshold to assess treble damages").

The FCC held that a willful TCPA violation is where the "violator knew that he was doing the act in question ... [and that the] violator need not know that his action of inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance." *In re Dynasty Mort., LLC*, 22 FCC Rcd 9453, 9470 n.86 (2007). The FCC used bumping a switch as an example of an act that could give rise to a violation which would not be construed as *willful. Id*. Under the TCPA, *willful* means that the act out of which a violation arises was not an accident or mistake, even if the resulting violation of the TCPA was unintended. *Charvat*, 879 N.E.2d at 771 ("We hold that to establish a willful violation of the TCPA for an award of treble damages, a plaintiff must prove that the defendant consciously and deliberately committed or omitted an act that violated the statute, irrespective of any intent to violate the law.").

The lower court's decision regarding *willful* violations is inconsistent with *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). Ashcroft only requires that to survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." The lower court's decision is also

inconsistent with *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). *Twombly* does not require detailed factual allegations, and recognizes that a cause of action is cognizable "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 555, 556.

It is no stretch to recognize that this suit could prove that DPI's calls were done intentionally, and not accidentally, which would be *willful* conduct under the TCPA.

**<u>The *American Blastfax* quote the lower court relied on is erroneous</u>**

The quote the lower court relied on (ECF 137 at 13, bottom) a quote which erroneously blurred the distinction between *willful* and *knowing* conduct and violations. It is also an objectively erroneous quote when traced back to the actual FCC source.

The lower court cited itself again, which in turn was quoting *American Blastfax*:

> The Federal Communications Commission has interpreted "willful or knowing" under the Telecommunications Act (of which the TCPA is a part), as not requiring bad faith, but only that the person have reason to know, or should have known, that his conduct would violate the statute.

*Id.*, citing *Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 463 (D. Md. 2012) (quoting *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892, 899 (W.D. Tex. 2001)). *Universal Elections* cited the original FCC decision, *In re Intercambio, Inc.*, 3 F.C.C.R. 7247, 1988 WL 486783 (F.C.C.1988), but the lower court did not. However, and importantly, the FCC's *Intercambio* decision never even mentions the words willful or willfully. The *American Blastfax* decision grouped *"willful or knowing*" together in quotes and attributed these terms to the FCC, which is clearly erroneous by including the term *willful* and giving it the same meaning as *knowing*. The *Intercambio* decision is cited correctly for the FCC's interpretation of *knowingly* under

47 U.S.C. § 223(b)(1), a different statute governing obscene or harassing telephone calls[1]. *Universal Elections*, and the lower court's reliance on it, are incorrect to the extent they relied on the erroneous *American Blastfax* decision on this point.

*Willful* and *knowing* (the TCPA's actual terms are *willfully* and *knowingly*) are separate and distinct terms. They should not be blended together or blurred during legal analysis. *Willful* has the explicit statutory definition at 47 U.S.C. § 312(f)(1) discussed *supra,* which makes it a more reliable term to consider. Since the disjunctive 'or'

---

[1] The relevant paragraph 29 from *Intercambio* stated (bolding emphasis added):

29. We interpret the term "***knowingly***" as used in Section 223(b)(1) consistent with this view of the statutory scheme. In order to establish the level of scienter necessary to satisfy this element of the offense, we need not establish that a message provider specifically intended to use telephone facilities to make an obscene communication to a particular minor, or to minors in general, for commercial purposes on an interstate basis. Rather, **we need only establish that the message provider knew or should have known that it was engaging in activities that could constitute a violation of the statute**.[Footnote 29] In this regard, we expect message providers to be aware of the manner and circumstances under which their telephone messages may be accessed. We also find that a message provider can reasonably be expected to be aware of the fact that children can and will access dial-it messages where there are no effective barriers to their doing so and that it should be held accountable for its failure to prevent such access. Furthermore, message providers in the business of transmitting sexually explicit telephone messages to callers for a fee can be expected to be aware of the content of the messages they are offering.

Footnote 29, within paragraph 29 of *Intercambio*, stated (bolding emphasis added):

29. Were we to interpret the term "**knowingly**" otherwise and allow a message provider's assertion that he never specifically intended to transmit his messages to a minor or minors to serve as a defense to prosecution under the statute in cases where those messages were in fact readily accessible to minors, the entire statutory purpose would be defeated. Message providers could readily avoid enforcement of the statute against them, and they would have no incentive to comply with the Commission's dial-a-porn regulation or take any other steps to restrict access to minors as Congress intended. A message provider offering a tape recording to all callers indiscriminately will never know whether an individual caller is a minor or adult. Accordingly, we reject an interpretation of "**knowingly**" that requires the message provider to intend that its messages be transmitted to minors as unreasonable under the statutory scheme, because it would allow noncompliance without risk of prosecution by all dial-a-porn providers, in direct contravention of Congressional intent.

separates willfully and knowingly in the TCPA statute, and only one of these types of conduct is required to be plead for treble damages, a court may choose for ease of analysis to limit its decision to interpreting willful/willfully.

The lower court's decisions that there is no set of facts upon which Worsham's plead claims for *willful* violations will be successful, and that his AC failed to plead facts for a claim for *willful* violations, is clearly erroneous, and should be reversed.

**_Knowing_ conduct and violations under the TCPA**

Worsham need not plead facts that DPI's violations were both *willful* and *knowing*, just one **or** the other. 47 U.S.C. § 227(c)(5). The argument *supra* establishes that the AC adequately plead facts that DPI's violations were done willfully. This section addresses the lower court's too high standard for pleading knowing violations.

The lower court (ECF 137 at 14, footnote 8) set and applied a standard for violations done knowingly (*knowing* conduct) under the TCPA that a defendant can only *know* its conduct is prohibited if the defendant has already been sued and found liable for violating the TCPA. Footnote 8 acknowledged DPI had been sued by both Worsham, and in a separate class action, prior to all 7 calls at issue in this suit received in November 2019. However, it then found these suits of no moment, and not facts supportive of pleading a knowing violation, because Worsham's suit settled[2], and the class action was dismissed. *Id.*

Defendants always deny having violated any law, even after a court or jury rules

[2] Worsham's 2017 Suit #1 against DPI was in the District Court for Harford County, Maryland, not the Circuit Court for Howard County, as the lower court's footnote 8 incorrectly stated.

against them, and even after an appeal court affirms. The lower court's footnote 8 ignores or minimizes the reality of what settlement really means for a defendant: we have some liability exposure, so let's settle, before our conduct becomes even more public and potentially a judgment. A settlement means at a minimum that a defendant is on notice about whatever they were sued about, and if they violate the same law after that, the previous suit is a factual basis upon which to allege that the same defendant's post-lawsuit conduct and any alleged violation is a knowing violation. The lower court treated the AC as if it was a summary judgment motion, and as if Worsham was required to prove knowing violations, rather than simply being required to allege them. This was clearly erroneous.

***Universal Elections* supports a lower pleading threshold for knowing violations**

The lower court's separate decision in another case supports the more correct and lower standard for an adequate pleading of *knowing* conduct and violations under the TCPA:

> there is no question that both Russell and Henson knowingly violated the TCPA disclosure requirements. Russell admits that she was aware of the relevant TCPA requirement months, if not years, before the relevant decisions in this case.

*Universal Elections*, 862 F. Supp. 2d at 463. Worsham made the same allegations that DPI was aware of the TCPA through his previous lawsuit against DPI, but which the lower court erroneously dismissed as inconsequential or inadequate with respect to pleading *knowing* violations. The very next sentence in *Universal Elections*, stated "And she acknowledges that she and Henson actively decided not to include the required identifying information in the message." Worsham made the same allegations

about DPI having not included the required identifying information in its calls in ¶¶ 19 and 64 cited *supra.,* and provided actual recordings of the calls to support this. Two sentences later *Universal Elections*, stated:

> Nonetheless, the court may infer from his actions that he acted knowingly. To begin with, in Henson's role as owner and officer of Universal Elections, he **undeniably had reason to know of and should have known about the TCPA disclosure requirements**.

*Id*. at 463-4 (emphasis added). Importantly *Universal Elections* found the actor "undeniably had reason to know of" the TCPA, and imputed the corporation's knowledge to the individual defendant owner and officer. Again, Worsham plead the same facts as those which *Universal Elections* cited here as supporting a finding that the defendant acted knowingly, through the previously discussed allegations that DPI had already been sued several times about the TCPA, and in ¶ 20 which explicitly and very plausibly alleged "Defendant is fully aware of the TCPA's requirements." The lower court erred in failing to recognize in footnote 8 that Worsham's pleading DPI's knowledge of the TCPA from previous suits is in full accord with *Universal Elections*.

A Texas case cited by both *Universal Elections* and the lower court also supports the correct and lower standard for pleading *knowing* violations. *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892, 899 (W.D. Texas 2001) stated that "Here, the defendants were well-aware of the TCPA when they began sending unsolicited intrastate fax advertisements in Texas in 1997" as part of its support for finding the American Blastfax defendants knowingly violated the TCPA. *American Blastfax* did not impose the higher factual pleading requirement that the lower court did in footnote 8, ruling that defendants's violations were knowing because they were well

aware of the TCPA when they began sending unsolicited fax ads. The fact that the defendants in *Universal Elections* and *American Blastfax* were very egregious TCPA violators whose conduct was easily and readily found to be both willful and knowing violations, does not mean that conduct with a lesser degree of knowledge on the violator's part can not also be plead to meet the *knowing* standard.

The lower court's decision regarding *knowing* violations is inconsistent with the *Universal Elections* and *American Blastfax* decisions, and a clear error of law, and should be reversed. The AC adequately plead facts for claims for violations done *knowingly* under the FCC standard of a company that "knew or should have known that it was engaging in activities that could constitute a violation of the statute." *Intercambio* at ¶ 29.

The lower court's erroneous decisions regarding both *willful* and *knowing* violations denied not only Worsham's claims for these in Counts 1 and 2, but also the additional discovery these claims warrant into DPI's knowledge and intentional conduct.

**Issue 2: The District Court erroneously dismissed Counts 3 and 7, because FCC Caller ID regulations at § 64.1601(e)(1) were issued pursuant to 47 U.S.C. §§ 227(b) and (c) and include a private right of action.**

Issue 2 regards Counts 3 (federal TCPA) and 7 (MD-TCPA), which allege violations of 47 C.F.R. § 64.1601(e)(1), which requires that:

> "*Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(7) must transmit caller identification information . . .*[and] *must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer.*"

The lower court ruled that a § 64.1601(e)(1) violation is a technical and

procedural standard violation under 47 U.S.C. § 227(d) for which there is no private right of action. ECF 47 at p. 10. The lower court relied solely on an earlier decision of the same lower court, *Worsham v. Travel Options, Inc.* Case JKB-14-2749, , 2016 U.S. Dist. LEXIS 118744, 2016 WL 4592373 (D. Md. Sep. 1, 2016)[3].

Worsham's opposition filings (ECF 34 and 72) explained that there is a private right of action for violations of § 64.1601(e)(1), which is a substantive Caller ID provision, and not a technical and procedural standard promulgated under 47 U.S.C. § 227(d). This detailed explanation starts below by addressing *Travel Options*.

**A. *Travel Options* was uncertain and incorrect about § 64.1601(e)(1)**.

*Travel Options* first observed (at *11) that it is "not clear whether a violation of § 64.1601(e)(1) falls within the private right of action granted by subsection b or subsection c."

Then, despite explicitly recognizing that "the FCC's rule in § 64.1601(e)(1) appears to support consumers' enforcement efforts under the TCPA's subsection c," *Travel Options* concluded that § 64.1601(e)(1) did not "create a separate mechanism upon which a consumer can make an actionable claim." *Travel Options* later (at *19-20) leapfrogged without support to the conclusion that "any violation of § 64.1601(e)(1) is a violation of technical and procedural standards under subsection d," which it concluded had no private right of action.

[3] The lower court also relied on *Travel Options* to reach its erroneous conclusion (ECF 47 at 9-10) that there is no private right of action for violations of 47 C.F.R. § 64.1200(d)(4), a conclusion it reversed itself over in its December 1, 2021 ruling (ECF 137) which granted Worsham's Motion for Reconsideration (ECF 80) and reinstated Counts 2 and 6.

## B. There is a private right of action for Caller ID violations of § 64.1601(e)(1).

The FCC usually does not identify which subsection(s) of the TCPA that its authority to promulgate its TCPA regulations is based on. The basis for TCPA liability for the Caller ID name or number violations therefore requires a close look at the TCPA's history.

Congress created two private rights of action for violations of the FCC regulations promulgated pursuant to the TCPA. 47 U.S.C. § 227(b)(3) and § 227(c)(5). Caller ID requirements in the regulation 47 C.F.R. § 64.1601(e)(1) directly furthers the goals of both § 227(b)(3) and § 227(c)(5), which was promulgated pursuant to both of these two sections. It applies to both automatically dialed or prerecorded voice calls ("robocalls") as well as live sales agent telemarketing calls.

In 1992, in the FCC's first TCPA Report and Order, the FCC discussed Caller ID, including possibly requiring a special prefix for telemarketers, but took no action, because the technology was relatively new then. However, in its later *2003 TCPA Report*, the FCC revisited the issue, and implemented the Caller ID requirements for telemarketing calls, and promulgated the following relevant section of its regulations:

**47 C.F.R. § 64.1601 - Delivery requirements and privacy restrictions.**

> (e) Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(10) must transmit caller identification information.
>
>> (1) For purposes of this paragraph, caller identification information must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer. It shall not be a violation of this paragraph to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller on behalf of which the telemarketing call is placed and the seller's customer service telephone number. The telephone number so provided must permit any individual

> to make a do-not-call request during regular business hours.
>
> (2) Any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information.
>
> (3) Tax-exempt nonprofit organizations are not required to comply with this paragraph.

68 Federal Register 44179, July 25, 2003. This regulation has been in effect unchanged since 2003. This regulation is clearly related to the TCPA and its primary goal for consumer privacy, by both its regulation of telemarketing, and concern for privacy, as stated in the regulations's very title: "Delivery requirements and **privacy restrictions**" (emphasis added).

The FCC made important points in 2003 explaining the need for a substantive new Caller ID requirement: "**Caller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers**." *FCC 2003 Report*, 18 FCC Rcd. 14014 at ¶ 91 (emphasis added). This lawsuit is exactly the enforcement the FCC identified in 2003. Had DPI transmitted Caller ID as required, much of its delay and denial about its calls would be eliminated, as would traceback subpoena needs. The FCC stated:

> The Commission has determined to require all sellers and telemarketers to transmit caller ID information, regardless of their calling systems." . . . Caller ID allows consumers to screen out unwanted calls and to identify companies that the wish to ask not to call again. . . Caller ID also should increase accountability and provide an important resource for the FCC and FTC in pursuing enforcement actions against TCPA and TSR violators.

*Id.* at ¶ 179 (citation omitted). The TCPA is a private attorney general statute. Caller ID is directly related to private enforcement. The FCC also pointed out:

> As explained above, the TCPA seeks primarily to protect subscribers from unrestricted commercial telemarketing calls. Therefore the Commission has determined not to extend the caller ID requirements to tax-exempt nonprofit organizations. However, the caller ID rules will apply to all other companies engaged in telemarketing, and the existence of an established relationship between the telemarketer and the consumer shall not be an exception to these rules.

*2003 TCPA Report* at ¶ 184. Since the Caller ID requirements at 47 C.F.R. § 64.1601(e)(1) were unambiguously promulgated by the FCC pursuant to its authority under the TCPA, and are directly related to the goals and purpose of the TCPA as just discussed, and since the TCPA provides a private right of action for violations of FCC regulations issued under the TCPA, 47 U.S.C. §§ 227(b)(3) and (c)(5), there is a private right of action for violations of § 64.1601(e)(1).

The *2003 TCPA Report* demonstrates that Caller ID requirements were promulgated to aid consumers frustrated by not knowing who called, and to aid enforcement of the TCPA. The FCC considered potential liability created by the then-new requirement and established a clear and convincing evidence burden on callers:

> Caller ID information must include either ANI or CPN and, when available by the telemarketer's carrier, the name of the telemarketer. If the information required is not passed through to the consumer, through no fault of the telemarketer originating the call, then the telemarketer will not be held liable for failure to comply with the rules. In such a circumstance, the telemarketer must provide clear and convincing evidence that the caller ID information could not be transmitted.

*2003 TCPA Report* at ¶ 179. The FCC's footnote 653 to the second sentence above showed that the FCC was specifically responding to liability concerns:

> *See* WorldCom Reply Comments at 26 (arguing that requiring caller ID could create an expectation in the minds of consumers that they should always receive the information and that such a regulation creates a situation where companies will be unfairly accused of breaking the law, and as a consequence, face undue

litigation and harm to their reputations).

*Id.* at n. 653. The term "liability" is used here in reference to the private right of action that a consumer - referenced in the same sentence, and also in the footnote with respect to consumer litigation - has to enforce the FCC rules for telemarketers under 47 U.S.C. § 227(b)(3) and § 227(c)(5). The promulgation of the FCC's Caller ID regulation in 2003 indicates overall that it was enacted pursuant to the FCC's authority under 47 U.S.C. § 227(b) and § 227(c).

As a remedial consumer protection statute, the TCPA should be liberally construed to prevent evasion and to effect its remedial purpose. " *Ginwright v. Exeter Finance Corp.*, 280 F. Supp. 3d 674, 683 (D. Md. Nov. 28, 2017), *Hooters of Augusta, Inc. and Sam Nicholson v. American Global Ins. Co. and Zurich Ins.,* 272 F. Supp. 2d 1365 (S.D. Ga. July, 2003) (concluding after reviewing the legislative history that the TCPA is a remedial statute).

One of the best ways to effectuate the TCPA's purpose is private enforcement. That is why Congress included two separate private enforcement sections at § 227(b)(3) and § 227(c)(5). The FCC's *2003 TCPA Report* is clear that the Caller ID rule was promulgated to enhance enforcement. This, and the liberal construction afforded to the TCPA, coupled with the FCC's directly addressing liability to consumers as a possibility arising from its then-new Caller ID rule, and the observation that the FCC passed the Caller ID rule for <u>all</u> types of telemarketing calls, and not just for the narrower scope of prerecorded calls covered in the TCPA's technical standards section (§ 227(d)), mandates a conclusion that the correct construction of the TCPA

and Caller ID rule at § 64.1601(e)(1) is that private enforcement is permissible through the private rights of action at § 227(b)(3) and § 227(c)(5).

### C. § 64.1601(e)(1) could not come from the TCPA's technical standards at § 227(d).

It is important to recognize that § 64.1601(e)(1) was promulgated to protect privacy for all calls pursuant to the FCC's authority under 47 U.S.C. § 227(b) and (c). It is equally important to recognize that § 64.1601(e)(1) could not have been promulgated pursuant to § 227(d), the technical standards subsection of the TCPA, because § 227(d) provides no statutory authority for the FCC to issue regulations of any kind for either (1) live telemarketing calls, or (2) Caller ID.

The FCC's Caller ID rule at § 64.1601(e)(1) could not have come from the TCPA's technical standards subsection at § 227(d), as *Travel Options* incorrectly concluded, because there is simply no statutory authority in § 227(d) for the Caller ID rule. The technical standards at § 227(d) only apply to fax machines (not at issue here), and to artificial or prerecorded voice systems. The technical standards do not, and can not, apply to live telemarketing solicitation calls, such as DPI's live solicitation Call #7 on November 15, 2019 (AC at ¶ 15).

**(1) There is no FCC authority in § 227(d) for live telemarketing calls.**

The FCC regulation at § 64.1601(e)(1) applies to "Any person or entity that engages in telemarketing as defined by [the FCC] . . ." The FCC includes live telemarketing solicitation calls in its definition of *telemarketing*. The technical standards at § 227(d) can and do not apply to live telemarketing solicitations, because the Congressional authority given to the FCC here only extends to fax machines, and

artificial and prerecorded voice messages. These technical standards could not have been the source of the FCC authority to promulgate § 64.1601(e)(1), because § 64.1601(e)(1) extends to and includes live solicitation calls.

**(2) There is no FCC authority in § 227(d) for Caller ID for ANY calls.**

The words "caller identification" (or ID) are not included anywhere within § 227(d). 47 U.S.C. § 227(d) does not provide the FCC with authority to promulgate regulations related to Caller ID for ANY calls, including fax machines or artificial or prerecorded voice messages.

The authority given to the FCC in § 227(d)(2) is limited to fax header identification requirements. The FCC's authority in § 227(d)(3) is limited to promulgating regulations for artificial or prerecorded voice messages requiring: (1) identification of the caller at the beginning of the message, (2) identification of the telephone number or address of the caller during or after the message, and (3) that any system automatically release the phone line within 5 seconds after the called party has hung up. § 227(d)(3)(A) and (B). Congress was specific about the technical standards it required, and Caller ID was *not* included among them.

This is logical, since in 1991 when the TCPA was passed, Caller ID was not available like now, and even less so in the years leading up to the TCPA's passage in 1991. Also, from a technical standpoint, Caller ID transmission is accomplished through a separate system from the system or equipment that delivers an artificial or prerecorded voice.

In summary, there is simply no statutory basis at all to conclude that the Caller

ID regulation at § 64.1601(e) was issued pursuant to § 227(d), a subsection which addresses other issues.

The AC plead that DPI's calls all failed to transmit a name via Caller ID, and a proper number as well, in violation of 47 C.F.R. § 64.1601(e)(1). The District Court improperly dismissed Counts 3 and 7.

**Issue 3: The District Court erroneously dismissed Counts 4 and 8, which plead facts for claims for violating the FCC robocall regulations.**

Count 4, and the Count 8 Maryland TCPA counterpart, state claims by alleging that Defendant's Calls 1-6 violated the TCPA at 47 U.S.C. § 227(b)(1)(B), and FCC regulation at 47 C.F.R. § 64.1200(a)(3), which provides that:

> "§ 227(b)(1)(B) - *Prohibitions: It shall be unlawful for any person . . .(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission."*

Key in this liability language is the word "*initiate*" as discussed below. Also key in analyzing these calls is recognizing that the robocall messages at the beginning of Calls #2-6, and the ensuing conversation between Worsham and the sales agent after Worsham pressed "1," are all part of the same call. In determining the purpose of these calls, there are <u>not</u> two different callers for each part of the same call, which a court can pick out just one of in ruling. There is just one caller responsible for initiating the entire call.

**A. Call 1: the AC plead that Call 1 was *initiated* and "constitutes telemarketing," and is not exempt even if not answered.**

Worsham did not answer Call 1. DPI, the alleged caller, failed to transmit a

Caller ID name and failed to leave a message with identifying information as required. The AC alleged several facts for why Call 1 is a robocall *initiated* by DPI.

First, the Caller ID number transmitted in Call 1 was the same exact Caller ID number 201-285-8284 transmitted in Calls 3, 4, 5 and 7, all made just days after Call 1. AC at ¶ 15. Second, during those same Calls 3, 4, 5 and 7, Discount Power was identified as the caller by the sales agents, as well as being identified in Call 6. *Id.* Third, during three of these calls (Calls 3, 4 and 5) with the matching Caller ID, the same exact robocall message was delivered. *Id.* Fourth, during Call 4, DPI's agent gave Worsham their customer service number, 877-334-0097, which still answers as "Discount Power." *See* AC at ¶ 15, at Call 4, and Worsham Aff., ECF 67-2, at ¶ 21.

*Lucas v. Telemarketer Calling from (407) 476-5680 and Other Telephone Numbers*, S.D. Ohio, August 27, 2013 (Case #1:12-cv-00630)[4] approved of linking calls together in this way. *Lucas* involved calls to a residential phone line, and in footnote 6, approved of an inference to link calls which transmitted the same Caller ID and/or same prerecorded message:

> We believe such an inference entirely appropriate. The telephone numbers from which the ten calls to Plaintiff containing a pre-recorded telemarketing message originated were assigned to Defendant Qall Cord on the dates in question. So, too, were the telephone numbers from which the two 'no message' calls originated. Moreover, Plaintiff received calls containing the same prerecorded telemarketing message both before and after the two 'no message' calls.

*Lucas* concluded that if a call is initiated, a message does not need to be left for a

---

[4] Worsham does not have Lexis or Westlaw, but *Lucas* is available at: https://scholar.google.com/scholar_case?case=8450461037548850605&q=Lucas+v.+Telemarketer+Calling&hl=en&as_sdt=6,39&as_vis=1

violation:

> Nowhere in these two subsections is an additional requirement that the caller leave a message in order to trigger a violation. Indeed, the definition of 'telephone solicitation' twice specifically references 'initiation of a telephone call or message,' not 'initiation of a telephone call and message.' Moreover, as the Sixth Circuit observed in *Charvat*, the 'regulations in 47 C.F.R. § 64.1200(d) impose minimum procedures for maintaining a do-not-call list that apply to all calls—live or automated—initiated for telemarketing purposes to residential telephone subscribers.' 656 F.3d at 449 (emphasis original). Thus, this Court concludes that a violation occurs upon the initiation of the call, regardless of whether a message is left.

*Lucas* awarded treble damages under the federal TCPA for two unanswered calls. Other courts agree: *Fillichio v M.R.S. Assocs*., 2010 U.S. Dist. Lexis 112780 at *9-10 (S.D. Fla. 2010) ("the prohibition in the TCPA applies to phone calls placed to cellular telephone numbers even if the intended recipient does not answer the calls. It is the mere act of placing the call that triggers the statute."), *Castro v. Green Tree Servicing LLC*, 959 F. Supp. 2d 698, 720 (S.D.N.Y.2013) ("[F]or purposes of Plaintiffs' TCPA claim, it is immaterial whether the Plaintiffs picked up all of Defendants' calls or whether several of the calls went unanswered."), *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015) ("TWC violated the statute each time it placed a call using its ATDS without consent, regardless of whether the call was answered by a person, a machine, or not at all.").

For Call 1, since pleading a violation § 227(b)(1)(B) requires only an allegation that the caller "*initiate*" the prohibited call, the pleading standard was clearly met, since Call 1 was plead to have not only been initiated but to have connected to Worsham's landline number, and to have transmitted the same Caller ID transmitted in four subsequent calls (Calls 3, 4, 5 and 7) that same week. This provision of the TCPA

protects residential privacy by stopping a would-be caller from even initiating a call, and not calling and then hanging up or failing to identify the caller or leave a message, just as occurred in Call 1, and which is a well known and annoying privacy invasion the TCPA was passed to prevent.

For Call 1, the AC alleges *e.g.* at ¶¶ 15 and 73 that Call 1 was initiated and made for a commercial purpose. Call 1 is not exempt under 47 C.F.R. ¶ 64.1200(a)(3)(iii), which exempts a call initiated to deliver a prerecorded voice message that "is made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing." This exemption does not apply to a call made for a commercial purpose if it constitutes telemarketing.

"*Telemarketing*" is defined broadly at § 64.1200(f)(13) to include "initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." A call or message is *telemarketing* as long as **the purpose** is to encourage a purchase. *Telemarketing* is **<u>not</u>** defined as a "call or message which encourages" a purchase. Call 1 was initiated, and completed since it reached Worsham, and its commercial purpose was to encourage purchase of goods or services, and the call and its Caller ID was transmitted to Worsham's number. Call 1 is not within the FCC exemption.

The AC at ¶ 73 alleges that DPI's robocall messages were intended to try to get Worsham to switch his electric service provider away from BG&E, and to induce him to purchase DPI's electric service, using a false and misleading "apology" message. The lower court's choice to believe this fake apology over Worsham's explicit

allegations to the contrary is clearly erroneous in deciding a motion to dismiss (or for summary judgment), and should be reversed.

### B. Calls 2 to 6: Many specific allegations in the AC plead facts that Calls 2-6 were initiated to deliver prerecorded voice messages for DPI.

Calls 2 through 6 were all clearly alleged in the AC at ¶ 15 to deliver a prerecorded voice message to Worsham's number, and audio recordings of these calls were entered into the record. Completed delivery of a prerecorded voice message is worse conduct than just the *initiation* of the call, which is what the statute prohibits, so the AC easily met the lower *initiation* pleading standard for Calls 2-6.

For Calls 2 to 6, the transmitted Caller ID and robocall message content was alleged in ¶ 15 of the AC. Worsham also alleged that 410-692-2749 is his residential number, and that he did not give his prior express permission to be called. AC at Introduction and ¶¶ 1, 7, 40, 44, and 70 (residential line); ¶¶ 15, 37, 73 (no permission or consent given). Calls 2 and 6 both transmitted locally spoofed Caller ID numbers (410-692-xxxx is the local exchange for Worsham's 410-692-2749 residential number), and both delivered a robocall message for discount electric power, the first half of which was identical in both calls, stating falsely: "**Hello. This is an apology call from your electric utility. You got overcharged by your third party supplier.** . . ". Calls 2, 3, 4, 5 all contained robocall messages offering the same 30% discount on electric power rates and urging the recipient to press 1. Worsham spoke with the same sales agent of DPI named Joselyn in Calls 3, 4, 5, and 7, who identified Discount Power by name in Calls 3-5, and was clearly calling on behalf of Discount Power again in her follow up Call 7.

In summary, DPI is directly linked to Calls 1-7 (including the robocalls Calls 1-6 at issue in Count 4) several ways: Directly by Discount Power being identified by name (Calls 3 to 6), by the same sales agent Joselyn (Calls 3, 4, 5, and 7), by identical robocall messages (Calls 3, 4, and 5), by the same 30% discount offer (Calls 2, 3, 4, and 5), by the same exact transmitted Caller ID number 201-285-8284 (Calls 1, 3, 4, 5, 7), and by partially identical messages and the use of locally spoofed numbers transmitted (Calls 2 and 6).

These allegations together properly plead a claim for a violation of U.S.C. § 227(b)(1)(B) for Calls 1-6 by DPI. *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555 (2007) (court should assume that the well plead facts are true, and to resolve all doubts and inferences in the pleader's favor, and "plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegality).

Accordingly, Counts 4 and 8 state claims for Calls 1-6 for violations of § 227(b)(1)(B) for DPI initiating a prerecorded voice message call without Worsham's prior express consent. The contrary decision was erroneous and should be reversed.

**Issue 4: The District Court erred in dismissing Counts 9-17 and not recognizing the Maryland TCPA's (MD-TCPA) private right of action for FCC and FTC violations.**

The lower court dismissed Counts 9-17 of the AC which allege violations of the MD-TCPA. This dismissal is erroneous because the MD-TCPA expressly creates a private right of action for the violations alleged in Counts 9-17 which is not preempted.

**Counts 9-11:**

Counts 9-11 allege MD-TCPA violations based on DPI's conduct which violated FCC regulations promulgated pursuant to the federal TCPA, which the MD-TCPA incorporates verbatim. Maryland Ann. Code, Commercial Law Art. ("CL") § 14-3201(2). Counts 12-17 allege MD-TCPA violations based on conduct which violated the Federal Trade Commission's (FTC's) Telemarketing Sales Rule (TSR), which the MD-TCPA also incorporates verbatim. CL § 14-3201(1).

The MD-TCPA is a succinct and unambiguous law. In the first section, in two simple paragraphs, it incorporates federal laws and regulations restricting telemarketing without any changes. CL § 14-3201. The second section provides remedies, including attorneys fees and actual or statutory damages of $500 per violation. CL § 14-3202.

The MD-TCPA's own remedies section does not depend on the federal TCPA or FTC's TSR's separate remedies provisions. If a violation of one of the federal restrictions is plead, and later proven, that violation becomes a MD-TCPA violation, and the appropriate applicable remedies are those in the MD-TCPA. The lower court erred in confusing a violation, with the private right and remedy for that violation.

For Counts 9-11, the lower court determined that the FCC regulations allegedly violated, 47 U.S.C. § 64.1200(b)(1)-(3), were issued pursuant to 47 U.S.C. § 227(d), the TCPA's technical and procedural standards subsection. However it then determined - erroneously - that because there is no private right of action associated with § 227(d), that there is no private right of action under the MD-TCPA.

This conclusion is erroneous because the MD-TCPA has its own private right

of action which is not pre-empted by the federal TCPA. 47 U.S.C. §227(f)(1) (state law only preempted if it "imposes more restrictive intrastate requirements"). The MD-TCPA simply adopts the federal TCPA requirements without change, and is not more restrictive. The MD-TCPA explicitly provides that "each prohibited telephone solicitation and each prohibited practice during a telephone solicitation is a separate violation." CL § 14-3202(c). This private rights provision for "each prohibited practice during a telephone solicitation" would have no purpose or meaning under the lower court's erroneous interpretation, which would impermissibly limit the right to only those restricted and illegal practices for which a federal right already exists. State and federal rights governing the same conduct can be and, as here, are different.

The lower court's dismissal of Counts 9-11 on the basis that the federal TCPA must have a private right of action in order for there to be a private right of action under the MD-TCPA has no logical or statutory support, contradicts the MD-TCPA's explicit remedies provisions, and would render the MD-TCPA partly inoperative. This is erroneous and should be reversed.

**Counts 12-17:**

The lower court repeated its error in Counts 9-11 for Counts 12-17, by applying and enforcing a different (FTC) remedy which does not apply to the MD-TCPA, and relying on an inapplicable case that never even considered the relevant issue.

The unambiguous language of the MD-TCPA creates a private right of action for violations of the FTC's TSR (16 C.F.R. § 310) alleged in Counts 12-17. CL § 14-3201(2). Maryland recognizes that "Congress also permitted states to impose more

restrictive intrastate requirements for telephone solicitations." *Worsham v. Nationwide Ins. Co.*, 138 Md. App. 487, 491 (2001). *Nationwide* recognized that "states are free to provide their own remedies for conduct that is not otherwise redressed in a private action under section 227(c)(5)." *Id.* at 502. The Maryland TCPA adopts the federal TCPA's restrictions without change, and is not more restrictive, but even if it was, the TCPA allows this.

The MD-TCPA creates no new restrictions. The only thing it does do is create private rights of action for existing federal restrictions. The lower court refused to recognize these rights, citing *Worsham v. Ehrlich*, 181 Md. App. 711 (2004). The Maryland state appellate courts, including *Ehrlich*, have not addressed FTC TSR violations under the MD-TCPA.

*Ehrlich's* reasoning can't be squared with the Maryland TCPA's specific creation in CL § 14-3201(1) of a private right of action for FTC TSR violations, which otherwise only exists when damages are over $50,000. 15 U.S.C. § 6104(a). This affirmative **right** of Marylanders is distinct from the private right of action created for TCPA/FCC violations at CL § 14-3201(2). *Ehrlich* incorrectly concluded that the Maryland legislature could not create a private right of action, because 47 U.S.C. § 227(f) (formerly 227(e)) "makes it clear that states can not create a private right of action under subsection (d)." *Ehrlich*, 181 Md. App. at 731. The TCPA does not limit or say anything about private rights of action created by states, only about states imposing more restrictive requirements. The MD-TCPA unambiguously created a private right of action for violations of both the FCC's and FTC's TSR regulations.

The lower court made several other erroneous conclusions in its first dismissal to justify dismissing Counts 12-17. These include that Worsham failed to allege that DPI made the calls, that the "messages sought to induce the purchase of any goods or services," that DPI "failed to transmit complete Caller ID information," "any facts that suggest [DPI] failed to pay the annual fee for the DNC list for his area code," "what 'misleading' statement was in fact made by [DPI]," and that Worsham's "number is not protected by under the DNC registry." ECF 47 at 14-15.

These supposed deficiencies were either addressed herein *supra*, addressed in the subsequently filed AC, except for the annual fee allegation. This was explicitly alleged in the AC at ¶57, and can be plausibly construed from DPI's numerous calls to Worsham. These infer failure to pay the national DNC registry fee, since it would make no sense to pay the fee, but then still call numbers like Worsham's on the national DNC list and risk liability.

This Court should reverse dismissal of Counts 12-17.

**Issue 5: The District Court erred in not compelling and extending discovery.**

The lower court's key discovery error was denying reasonable discovery on DPI's communications with its telemarketers. Worsham consistently pursued discovery, but the court denied his motions to compel (ECF 144) and to extend discovery (ECF 242), despite good cause to compel DPI and extend discovery under FRCP 16(b)(4) and FRCP 56(d).

**1. Motion to compel discovery.**

On December 6, 2021 Magistrate Judge Coulson denied Worsham's motion to

compel DPI. ECF 144. Worsham's timely objections (ECF 163) were denied by Judge Bennett. ECF 228. These denials were abuses of discretion for the discovery below:

**Interrogatory 11:** The court erred in not compelling DPI to identify all persons responsible for ensuring DNC compliance. This Interrogatory tracks and is directly relevant to the DNC violations in Count 1, and also integral to DPI's affirmative good faith defense.

**Document Requests 2 and 15:** These seek communications, scripts, and messages that DPI had with its telemarketers Hound Energy, and Xtrasource. The Magistrate ordered a further response, but very narrowly limited that to just November 11-15, 2019 and the 410 area code.

This five day time frame is much too narrow. What if DPI had no or little contact with its telemarketers those particular five days? The required further production should include all scripts or messages that DPI either provided or approved for these two admitted telemarketers, and all their communications with DPI during at least November 2019. Telemarketing scripts and messages are not static, and can change often during the weeks or months of a calling campaign, and in individual calls.

The Magistrate's exact wording was to produce scripts and messages "that would have been applicable to the seven calls at issue during the relevant timeframe in Maryland's 410 area code." ECF 144 at 3. This overly narrow scope allows DPI to conclude on its own that none apply, and not produce a single one of the scripts or messages it approved and profited by. All scripts and messages DPI provided or approved are relevant, including DPI's control over them, and those DPI approved or

accepted the benefit of after the fact, which constitutes ratification, relevant to and one way of establishing agency. This Court should reverse the lower court's overly narrow five day time period, even if it does not require production for all of 2019 as Worsham requested in Request 15.

The FCC states that "a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within is power to force the telemarketer to cease that conduct." *In the Matter of The Joint Petition Filed by DISH Network, LLC, et al.*, Declaratory Ruling, FCC 13-54, 28 FCC Rcd 6574 (May 9, 2013) at ¶ 46 ("2013 *Dish Network Ruling*"). The FCC stated:

> **At a <u>minimum</u>, evidence of these kinds of relationships - which consumers may acquire through discovery**, if they are not independently privy to such information - should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent.

*Id.* (all emphasis added).

Worsham and a court can't properly analyze the seller-telemarketer relationship, if their communications are kept hidden. Obviously something went wrong to call Worsham 7 times even after he already sued DPI. DPI can't deny its telemarketers were its agents until it provides their communications, which the FCC stated is the ***minimum*** evidence that a consumer should be allowed to acquire in discovery.

Worsham is entitled to DPI's communications with its telemarketers for more

than just a five day period, and the lower court erred in not compelling this.

**2. Motion to extend discovery**.

Worsham filed timely objections (ECF 248) to the Magistrate's Order (ECF 242) denying an extension. Judge Bennett denied the discovery extension in one sentence in his Letter Order, ECF 258. Discovery should have been extended to allow the discovery from DPI discussed above, and to allow Worsham to complete all call traceback subpoenas.

The District Court erred in not compelling and extending discovery.

**Issue 6: The District Court erred in summary judgment by not considering TCPA liability under § 227(c)'s "on behalf of" language.**

The lower court's biggest error was explicitly failing to consider the actual claims in Counts 1 and 2, and related MD-TCPA Counts 5 and 6, and only considering vicarious liability. ECF 302 at 18 ("it is unnecessary to reach the parties' arguments on each count of the Amended Complaint) and n. 7 ("summary judgment is warranted on the question of agency alone"). This is erroneous, because vicarious liability is not the correct standard for Counts 1 and 2, for which liability properly arises from the "by or on behalf of" language in § 227(c)(5), and/or the non-delegation doctrine, discussed *infra*.

The TCPA's "by or on behalf of" liability language is broader than vicarious liability, and does not require seller-telemarketer agency to establish vicarious liability. If the calls were made by or on behalf of DPI, including by independent contractors who are not agents, DPI is liable under the plain language of § 227(c)(5). *Worsham v.*

*Nationwide Ins. Co.*, 138 Md. App. 487, 504 at n. 9 (2001) ("The TCPA reaches not only the entity making the telephone solicitation, but also any entity 'on whose behalf' such calls are made").

The lower court actually recognized that Worsham's subpoena trace results found evidence establishing a connection between the calls and DPI's telemarketers Hound Energy and Xtrasource, ECF 302 at 16, middle ("At best, Hound Energy and AGR were responsible for independently soliciting customers for Discount Power"). It found the calls were made on behalf of DPI. ECF 302 at 16, bottom ("Worsham asserts in his affidavit that "Joselyn" stated that she was calling on Discount Power's behalf and eventually offered [DPI's] customer service number"). It brushed away this Affidavit and other evidence in its agency/vicarious liability analysis, but failed to consider this evidence under the correct "by or on behalf of" liability standard. These were clear summary judgment errors.

Worsham's subpoenas established that Calls #1, 3, 4, 5, and 7 of the AC were made by Xtrasource on behalf of DPI. ECF 233-4, ECF 233-5 (CCS Affidavit). Worsham's Affidavit (ECF 276-2) established the other necessary evidence for Counts 1-2 and 5-6, including his residential number being on the DNC list, receipt of five telemarketing calls within 12 months, DPI's lack of permission, and failure to identify the caller. Summary judgment establishing liability should have been granted for these five calls for Counts 1-2 and 5-6. Accordingly, this Court should award summary judgment to Worsham, and reverse the lower court's grant of summary judgment to DPI.

**Issue 7: The District Court erred in summary judgment by not recognizing the non-delegation doctrine, which does not require agency.**

**<u>Sellers Have a Nondelegable Duty to Comply With the TCPA</u>**

DPI is a seller and directly liable for violating the duties arising under federal law pursuant to the Supreme Court's nondelegation doctrine.

Fifty years ago this Court applied a nondelegable duty to comply with Title VII of the Civil Rights Act in *Robinson v. Lorillard Corporation*, 444 F.2d 791 (4th Cir. 1971), holding Lorillard liable for discriminatory hiring:

> The rights assured by Title VII are not **rights which can be bargained away - either by a union, by an employer, or by both acting in concert**. Title VII requires that both union and employer represent and protect the best interests of minority employees. Despite the fact that a strike over a contract provision may impose economic costs, if a discriminatory contract provision is acceded to **the bargainee as well as the bargainor will be held liable**.

*Id.* at 799 (emphasis added).

*Lorillard* is the nondelegation doctrine applied to compliance with a federal statute. *C.f. Morrison-Knudsen Co. v. NLRB*, 275 F.2d 914, 917 (2nd Cir.1960), *cert. denied*, 366 U.S. 909 (1961) ("But regardless of the extent of their knowledge we agree with the Board that an employer may not avoid liability for violations of the Act by the hiring hall when he has turned over to it the task of supplying the men to be employed.").

The Supreme Court recognized the nondelegation doctrine in *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 395-96 (1982):

> The concept of a nondelegable duty imposes upon the principal not merely an obligation to exercise care in his own activities, but to answer for the well-being of those persons to whom the duty runs. **The duty is not discharged by using**

> **care in delegating it to an independent contractor. Consequently, the doctrine creates an exception to the common-law rule that a principal normally will not be held liable for the tortious conduct of an independent contractor**. So understood, a nondelegable duty is an affirmative obligation to ensure the protection of the person to whom the duty runs.

*General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 395-96 (1982) (emphasis added), *Marrs v. Rife*, 503 F. 2d 735 (6th Cir. 1974) (citing federal cases that the duty to comply with the law is non-delegable).

The nondelegation doctrine prevents defendants from simply contracting out a duty imposed on them by a federal law designed to protect consumers like Worsham, to whom the duty is owed. The TCPA created a substantive federal right modifying and extending the common law rights and remedies in telephone privacy. *C.f. Engel v. Davenport*, 271 U.S. 33, 38 (1926) (recognizing Section 6 of the Federal Employers' Liability Act as "a material provision of the statutes 'modifying or extending the common law right or remedy in cases of personal injuries to railway employees' which was adopted by and incorporated in the Merchant Marine Act.").

FELA modified or extended common law rights for railway employees with personal injuries. The TCPA modified common law agency principles for the rights of consumers with respect to sellers who target consumers with telemarketing.

**<u>The FCC recognizes TCPA requirements as nondelegable</u>**

In 2000 the FCC recognized TCPA requirements as nondelegable in *In the Matter of Long Distance Direct, Inc.*, 15 FCC Rcd. 3297 at ¶ 9, n. 12 (Feb. 17, 2000), stating:

> To hold that the section does not include independent contractors would create a gaping loophole in the requirements of the Act and frustrate legislative intent. Moreover, the construction urged by LDDI is contrary to long-established principles of common law holding statutory duties to be nondelegable.

The section referred to is 47 U.S.C. § 217, which provides:

> In construing and enforcing the provisions of this chapter, the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person.

In *Long Distance Direct, Inc.* at footnote 12 the FCC emphasized that nondelegation liability is applied routinely for a breach of a statutory duty by independent contractors:

> Employers are routinely held liable for breach of statutory duties, even where the failings are those of an independent contractor, and even where the party seeking redress is other than the government. *See Restatement* [*Second] of Torts* § 409, comment b at 371. *See also, e.g., Alva Steamship Co., Ltd. v. City of New York,* 616 F.2d 605, 609 (2d Cir. 1980) (exception to the rule of nonliability for the negligence of independent contractor is "the negligence of an independent contractor who performs a duty imposed by statute on the employer").

As the FCC noted, the Second Circuit recognizes the nondelegation doctrine:

> Ordinarily, of course, an employer is not liable for the negligence of an independent contractor, but there are several well-recognized exceptions to this rule. **One of these is that an employer may remain liable for the negligence of an independent contractor who performs a duty imposed by statute on the employer**.

*Alva Steamship,* 616 F.2d at 609 (emphasis added). *Alva Steamship* added that "because the Fire Department order had the force of law the shipowners were under a non-delegable duty to see to it that the inerting procedure was performed with the safeguards mentioned in the order." *Id.* at 609-610. *State of Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 414 (D. Md. 2011), also imposed liability on principals

for acts of a non-agent contractor broadcaster of robocall messages.

The nondelegation doctrine is recognized by the Supreme Court, two federal circuit courts including this Court, and by the FCC explicitly for the TCPA. The lower court erred (ECF 302 at 14) in asserting that District Courts have routinely rejected the non-delegation doctrine in TCPA cases, as few have even considered it. It committed legal error in rejecting the Supreme Court's nondelegation doctrine.

**Issue 8: The District Court erred in awarding discovery sanctions without reviewing or even requesting the deposition transcript containing the testimony for which sanctions were awarded.**

The lower court erred in ordering (ECF 251) Worsham to return to his already overlong 3.5 hour deposition, and in awarding $4,219 in sanctions against Worsham, without even reviewing the deposition transcript. ECF 267 and 283.

Incredibly, the court erred by failing to review or even request Worsham's deposition transcript. It can't possibly make any deposition discovery ruling if it does not even review the relevant transcript.

On February 11, 2022 DPI deposed Worsham for over 3.5 hours, more than enough time for a non-class action case involving 7 phone calls. The undisputed evidence in the record is that DPI's 3.5 hours of questioning was repetitive, its counsel's comments quite often argumentative, with many irrelevant and harassing questioning, including about Worsham's income taxes. April 26, 2022 Worsham Affidavit, ECF 261-2 at ¶¶ 3-7.

Notably, in a separate discovery, Magistrate Judge Coulson requested (ECF 234) the transcript of Worsham's deposition of DPI, which Worsham provided.

However, despite Worsham's specific request (ECF 261 at 12, bottom) that the lower court request the transcript of DPI's 3.5 hour deposition of Worsham in deciding DPI's sanctions motion, the Magistrate never even requested this transcript, and ruled on DPI's motion without the transcript. Only months later, after the Magistrate had already awarded sanctions, was the Worsham transcript filed by DPI.

The Magistrate's award is independently reversible because DPI failed to show any specific or relevant topics or areas that it was prevented from deposing Worsham about in its already overly long 3.5 hour deposition, making only vague and generic suppositions.

The Magistrate's award was also procedurally erroneous. DPI failed to follow the Magistrate's Order (ECF 89) for required procedures for resolving discovery disputes. In a separate discovery Order (ECF 112) the Magistrate did apply to Worsham and refused to even consider that dispute. The disparity here is grossly unfair.

Accordingly, the sanctions award should be reversed.

WHEREFORE this Court should reverse and remand.

Respectfully submitted,

/s/ Michael C. Worsham

Michael C. Worsham, Plaintiff
1916 Cosner Road
Forest Hill, Maryland 21050
410-557-6192
michael @ magicmichael.net